UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| KAYLA M. SPURLOCK, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No.: 1:14-cv-1106-WTL-DML |
| | ) |
| CAROLYN W. COLVIN, Acting | ) |
| Commissioner of the Social Security, | ) |
| Administration, | ) |
| | ) |
| Defendant. | ) |

## Report and Recommendation on
## Complaint for Judicial Review

This matter was referred to the Magistrate Judge under 28 U.S.C.

§ 636(b)(1)(B) and Fed. R. Civ. P. 72(b) for a report and recommendation as to its

appropriate disposition.  (Dkt. 19). As addressed below, the Magistrate Judge

recommends that the District Judge REVERSE AND REMAND the decision of the

Commissioner of the Social Security Administration that plaintiff Kayla M.

Spurlock is not disabled.

## Introduction

Ms. Spurlock applied in February 2011 for Child's Disability Insurance

Benefits (DIB) under Title II of the Social Security Act,[1] alleging she has been

disabled since age 9. Acting for the Commissioner of the Social Security

---

[1]      The Child's Disability Benefits program is available to an adult who became
disabled before age 22 and who has a parent whose earnings record qualifies the
child for Title II benefits.

Administration following a video hearing on February 4, 2013, administrative law judge Regina L. Sleater issued a decision on March 5, 2013, that Ms. Spurlock is not disabled.  The Appeals Council denied review of the ALJ's decision on May 2, 2014, rendering the ALJ's decision for the Commissioner final.  Ms. Spurlock timely filed this civil action under 42 U.S.C. § 405(g) for review of the Commissioner's decision.

Ms. Spurlock contends the ALJ failed to adequately evaluate whether her medical conditions met or equaled a listing.  She also asserts the ALJ erred in her credibility evaluation.

## Standard for Proving Disability

To prove disability, a claimant must show that she is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. § 423(d)(1)(A) (DIB benefits).  Ms. Spurlock is disabled if her impairments are of such severity that she is not able to perform the work she previously engaged in and, if based on her age, education, and work experience, she cannot engage in any other kind of substantial gainful work that exists in significant numbers in the national economy.  42 U.S.C. § 423(d)(2)(A).  The Social Security Administration ("SSA") has implemented these statutory standards by, in part, prescribing a five-step sequential evaluation process for determining disability.  20 C.F.R. § 404.1520.

Step one asks if the claimant is currently engaged in substantial gainful activity; if she is, then she is not disabled.  Step two asks whether the claimant's

impairments, singly or in combination, are severe; if they are not, then she is not disabled.  A severe impairment is one that "significantly limits [a claimant's] physical or mental ability to do basic work activities."  20 C.F.R. § 404.1520(c).  The third step is an analysis of whether the claimant's impairments, either singly or in combination, meet or medically equal the criteria of any of the conditions in the Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1.  The Listing of Impairments includes medical conditions defined by criteria that the SSA has pre-determined are disabling, so that if a claimant meets all of the criteria for a listed impairment or presents medical findings equal in severity to the criteria for the most similar listed impairment, then the claimant is presumptively disabled and qualifies for benefits.  *Sims v. Barnhart,* 309 F.3d 424, 428 (7th Cir. 2002).

If the claimant's impairments do not satisfy a listing, then her residual functional capacity (RFC) is determined for purposes of steps four and five.  RFC is a claimant's ability to do work on a regular and continuing basis despite her impairment-related physical and mental limitations.  20 C.F.R. § 404.1545.  At the fourth step, if the claimant has the RFC to perform her past relevant work, then she is not disabled.  The fifth step asks whether there is work in the relevant economy that the claimant can perform, based on her vocational profile (age, work experience, and education) and her RFC; if so, then she is not disabled.

The individual claiming disability bears the burden of proof at steps one through four.  *Bowen v. Yuckert,* 482 U.S. 137, 146 n.5 (1987).  If the claimant meets that burden, then the Commissioner has the burden at step five to show that work

3

exists in significant numbers in the national economy that the claimant can perform, given her age, education, work experience, and functional capacity. 20 C.F.R. § 404.1560(c)(2); *Young v. Barnhart,* 362 F.3d 995, 1000 (7th Cir. 2004).

## Standard for Review of the ALJ's Decision

Judicial review of the Commissioner's (or ALJ's) factual findings is deferential. A court must affirm if no error of law occurred and if the findings are supported by substantial evidence. *Dixon v. Massanari,* 270 F.3d 1171, 1176 (7th Cir. 2001). Substantial evidence means evidence that a reasonable person would accept as adequate to support a conclusion. *Id.* The standard demands more than a scintilla of evidentiary support, but does not demand a preponderance of the evidence. *Wood v. Thompson,* 246 F.3d 1026, 1029 (7th Cir. 2001).

The ALJ is required to articulate a minimal, but legitimate, justification for her decision to accept or reject specific evidence of a disability. *Scheck v. Barnhart,* 357 F.3d 697, 700 (7th Cir. 2004). The ALJ need not address every piece of evidence in her decision, but she cannot ignore a line of evidence that undermines the conclusions she made, and she must trace the path of her reasoning and connect the evidence to her findings and conclusions. *Arnett v. Astrue,* 676 F.3d 586, 592 (7th Cir. 2012); *Clifford v. Apfel,* 227 F.3d 863, 872 (7th Cir. 2000).

## Analysis

### I.   The ALJ's Sequential Findings

Ms. Spurlock was born in 1993, was 9 years old as of her alleged onset date, and was 18 years old at the time she applied for Child's DIB. At step one, the ALJ

determined Ms. Spurlock had not engaged in substantial gainful activity since her alleged onset of disability. At step two, she found Ms. Spurlock has two severe impairments: (1) psychogenic non-epileptic seizures and (2) obesity. At step three, she found no listing had been met or medically equaled. For purposes of steps four and five, the ALJ decided Ms. Spurlock has the residual functional capacity (RFC) to perform the full range of work at all exertional levels with the following limitations: she can never climb ladders, ropes, or scaffolds and must avoid exposure to open machinery and unprotected heights, and she must be permitted to miss work one-half day every two weeks or one day per month. (R. 20).

With this RFC, Ms. Spurlock's vocational profile, and based on the testimony of a vocational expert, the ALJ determined that Ms. Spurlock is capable of performing the requirements of jobs as an assembler, hand packer, or information clerk, which are available in significant numbers in the economy. Accordingly, she determined at step five that Ms. Spurlock was not disabled.

## II. The ALJ's evaluation of Ms. Spurlock's seizures is not supported by substantial evidence.

### A. Ms. Spurlock has a long, continuous history of seizures.

As the ALJ recognized, Ms. Spurlock has a long history of seizures—back to 2003. Medical records reported she was first diagnosed with seizures at a young age, and she continues to suffer from seizures. At age 10, she was seen by a neurologist after having exhibited seizure-type activity. At age 15, she was again seen by a pediatric neurologist who noted that Ms. Spurlock's seizure activity had increased since her mother had died from a seizure in 2006, when Ms. Spurlock was

13 years old.  The doctor noted her history included evidence of epileptic seizures but that some EEG studies showed normal activity.  (R. 21).  Ms. Spurlock was treated with medication to help control the seizures.  At age 16, in August 2009, Ms. Spurlock was seen in the emergency room because of headaches and seizures, and after follow-up care and evaluation, her doctor suspected she was having non-epileptic seizures in addition to epileptic seizures.  (R. 199).

Ms. Spurlock was referred to a psychologist (or to be precise, doctors referred her father and stepmother to take Ms. Spurlock to a psychologist).  Apparently, Ms. Spurlock's parents did not always arrange for her to attend appointments with the psychologist.  (*See* R. 193, 293)  Ms. Spurlock's seizures continued to occur, and she suffered at least three seizures at school in the fall of 2009 (in August, November, and December 2009).  (R. 22, 191 (emergency room encounter after suffering seizure at school), 193 (report of generalized seizure at school with teacher reporting she had turned blue, 207 (emergency room encounter after 3-4 minute seizure at school)).  In fact, Ms. Spurlock had been home-schooled for a period because of the frequency of her seizure activity.  She was later enrolled in an "alternative" school where she attended classes only in the afternoon so she could sleep in and be fully rested.  Lack of sleep was thought to be a trigger of seizure activity.  (R. 207, 213).

Ms. Spurlock was seen in an emergency room for multiple seizures again in February 2011, and noted she usually has one seizure per week.  (R. 225).  At this time, she was no longer living with her father and stepmother. She had stopped living with them the year before at age 17 and had begun living with her boyfriend

6

and his grandmother.  (R. 259-60). Her doctor recommended a change in medication and referral to a psychiatrist who specializes in non-epileptic seizures. The doctor also considered a referral to the epilepsy clinic should Ms. Spurlock continue to have seizures that could not be deemed non-epileptic seizures.  (R. 265).  These plans were altered when Ms. Spurlock learned she was pregnant in mid-2011.  (R. 265).  Ms. Spurlock was seen by her doctors later in 2011 and in early to mid-2012 for additional seizure activity.

In August 2012, Ms. Spurlock underwent testing similar to testing she had had in the past (a video EEG) to evaluate the nature of her seizures.  A three-day video EEG was conducted.  During that time, no epileptic activity was noted but there were two episodes of psychogenic non-epileptic events.  (R. 22).  Based on these results, Ms. Spurlock was referred to a psychologist.  (R.22).  According to a doctor's evaluation in November 2012, Ms. Spurlock had lost her Medicaid coverage after the August 2012 testing and consultation "and was unable to continue with psychiatry follow-ups, so she never saw them outside of the hospital."  (R. 63). Apparently, by the time of the November 28, 2012 visit, Ms. Spurlock's Medicaid coverage had been reinstated.  (R. 65).  The doctor made a referral for a psychiatric appointment and Ms. Spurlock indicated she would be able to follow through with such an appointment.  (R. 67).  No records were submitted documenting follow-up psychology visits.  Ms. Spurlock testified she has been waiting for her doctor to set up the appointment.  (R. 68).

**B. The ALJ's step three decision lacks sufficient explanation.**

The ALJ did not provide a reasoned evaluation of Ms. Spurlock's seizure disorder for purposes of step three.  Her step three determination is perfunctory.  It gives insufficient insight into the evidence the ALJ considered, the listing(s) she considered, or how she arrived at a conclusion that no listing was met.  The decision states:

> The claimant, who is represented by counsel, did not contend or advance any evidence to suggest that his [sic] impairments, either singly or in combination, met or medically equaled the requirements of a listed impairment.  There is no substantial evidence present in the record that the claimant's impairments, either singly or in combination, met or medically equaled the requirements of a listed impairment.

(R. 20).  The court is unable to trace the path of her reasoning.  These two sentences read like boilerplate that could be inserted into any decision about any claimant for whom an administrative law judge finds disability was not shown at step three.[2]

Moreover, it is not the claimant's responsibility to outline at the administrative hearing the medical evidence that may prove the claimant's impairments meet or medically equal a listing.  It is the ALJ's role to determine, based on the evidence in the record, whether a listing is satisfied.  And there must be some expert medical opinion to support a finding that a listing has not been met or medically equaled.

---

[2]     The ALJ's use of the wrong pronoun when referring to the claimant tends to further the impression that her step three analysis was a cursory copy and paste recitation.

Here, the administrative record shows that no medical expert evaluated all of the important evidence to determine whether Ms. Spurlock's seizures meet or medically equal a listing. The state agency expert reports evaluating Ms. Spurlock's mental impairments and the applicability of the mental health listings expressly excluded an evaluation of her seizures. The report from the mental status examination stated that the "physical issues were not discussed" during the examination. (R. 329-31). It is clear from the context of the examination report that the reference to "physical issues" is to Ms. Spurlock's seizures. The listings evaluation, which relied principally on the mental status examination, stated that a "coexisting nonmental impairment . . . requires referral to another medical specialty." (R. 333). The reference is to Ms. Spurlock's seizures.

The medical expert at the hearing, a doctor specializing in neurology, stated he had not been provided with Ms. Spurlock's recent medical records, which included about 100 pages of documents covering the period late 2011 through November 2012. (R. 60-61). These records—all dated after the state agency evaluators had reviewed Ms. Spurlock's file—document several doctor visits related to seizures. They also contain evaluative materials from August 2012 and November 2012 by physicians who concluded that Ms. Spurlock's appropriate diagnoses are psychogenic non-epileptic seizures and a conversion disorder (mental health-related impairments). The ALJ read to the expert over the phone during the hearing a three-page narrative dated November 28, 2012, addressing the capturing of "psychogenic non-epileptic spells" during the August 2012 EEG and the doctor's

recommendation to treat this "confirmed diagnosis." (R.66). The testifying medical expert ultimately confirmed he had not and could not evaluate whether any of the mental health listings were met based on Ms. Spurlock's seizure history. (R. 70). He said: "[I]t is my recommendation that [INAUDIBLE] that it meet a psychological listing, and a psychiatrist or a psychologist would evaluate that." (R. 70).

The court is unable to conclude that the ALJ's discussion at step three is harmless error, particularly since critical (even "game-changing") documents were not available to the state agency mental health experts when they reviewed Ms. Spurlock's records and had classified Ms. Spurlock's seizures as a physical issue to be evaluated by different experts. It appears too that even if Ms. Spurlock's seizures are psychologically-based, expert analysis may be required to determine whether she medically "equals" one of the neurological listings. The medical expert at the hearing stated that no listing was met, but it does not appear he evaluated the possibility that a listing was medically equaled based on the number, severity, and symptomology of Ms. Spurlock's seizures as shown by years' worth of medical records of her seizures.[3]

### C. The ALJ's credibility determination is flawed.

The ALJ's credibility determination is also flawed in important respects. The ALJ discounted Ms. Spurlock's credibility on the grounds she (a) had been suffering

---

[3]    The ALJ's decision states that the medical expert testified no listing was met or equaled (R. 23), but the expert's testimony does not discuss the possibility of "equaling" a listing.

from psychologically-based seizures all along but had not followed recommendations to see psychologists and (b) she is a caregiver for a one-year old baby and thus obviously engages in greater activity than she admitted.  These reasons, in large part, seem to misrepresent the record.  First, the ALJ appears unfairly to blame Ms. Spurlock for having failed regularly to see a psychologist when she was a teenager and her father or stepmother controlled her access to medical care.  The ALJ also did not acknowledge Ms. Spurlock had lost her Medicaid insurance coverage after she was first formally diagnosed in August 2012 with psychogenic non-epileptic seizures.  The ALJ's statement that Ms. Spurlock failed to pursue psychological evaluation for over three years (R. 22), without acknowledging these barriers to her treatment, is an obvious flaw in her analysis. Second, the administrative record reflects years and years of visits to doctors because of the seizures, rather than the existence of a three-year period Ms. Spurlock refused to seek proper treatment.  An ALJ must not ignore evidence that is contrary to the conclusions she draws.  *See Arnett v. Astrue,* 676 F.3d 586, 592 (7th Cir. 2012) (ALJ cannot ignore evidence that undermines the conclusions she made).

Third, the ALJ did not explain how Ms. Spurlock's ability to care for her baby undermined her testimony.  She testified that her boyfriend takes her and the baby every morning to his grandmother's house while he is at work for the very reason they are concerned Ms. Spurlock may have a seizure if she were alone with the baby, and the ALJ did not appear to question the veracity of that testimony.  (R. 22, 73, 78).

11

**D.  The RFC should be revisited on remand.**

The ALJ based her RFC on the opinion dated August 2011 by a state agency doctor who reviewed the medical evidence.  (R. 23, 349-356). The doctor supported his opinion with the notations that Ms. Spurlock had had a normal neurological examination in April 2011 and the levels of certain of her medications were subtherapeutic.  (354). He also stated that Ms. Spurlock is "partly credible."  It is unclear what the reviewer meant, except he may have been suggesting that the lack of an apparent neurological basis for the seizures made Ms. Spurlock only "partly credible."   But the fact the latest evidence (from 2012) suggests Ms. Spurlock's seizures are non-epileptic and have psychological triggers does not mean they do not occur.

It is essential for a disability claimant's medical problems to be considered in combination.  *Goins v. Colvin,* 764 F.3d 677, 680 (7th Cir. 2014) ("We keep telling the Social Security Administration's administrative law judges that they have to consider an applicant's medical problems in combination").  It appears here, however, that Ms. Spurlock's physical limitations because of seizure activity may have been discounted or not accommodated because of the lack of underlying neurological causes even though there is substantial evidence that they relate to a real mental impairment the state agency medical experts did not evaluate.

Because the ALJ's step three analysis was too perfunctory to allow for meaningful review, her credibility analysis was flawed in critical respects, and her RFC decision appears to be based primarily on the lack of a neurological cause of

Ms. Spurlock's seizures, the court finds the Commissioner's decision is not supported by substantial evidence. The court does not suggest a finding of disability is required.

## Conclusion

For the foregoing reasons, the Magistrate Judge recommends that the District Judge REVERSE AND REMAND the Commissioner's decision under sentence four of 42 U.S.C. § 405(g). Any objections to this Report and Recommendation must be filed in accordance with 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P 72(b). The failure to file objections within 14 days after service will constitute a waiver of subsequent review absent a showing of good cause for that failure. Counsel should not anticipate any extension of this deadline or any other related briefing deadlines.

IT IS SO RECOMMENDED.


Dated: August 6, 2015


_Debra McVicker Lynch_
Debra McVicker Lynch
United States Magistrate Judge
Southern District of Indiana

Distribution:

All ECF-registered counsel of record by email through the court's ECF system